FILED
CLERK

4:54 pm, Aug 03, 2021

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
................................................................X

N. B.,

              Plaintiff,

        -against-

UNITED STATES OF AMERICA, UNITED
STATES DEPARTMENT OF
TRANSPORTATION, UNITED STATES
MERCHANT MARINE ACADEMY, JOHN
DOES 1-10,

              Defendants.
................................................................X

**MEMORANDUM AND
ORDER**

21-cv-1664 (GRB)(SIL)

**GARY R. BROWN, United States District Judge**:

*"Few decisions properly rest so exclusively within the discretion of the appropriate government officials than the selection, training, discipline and dismissal of the future officers of the military and Merchant Marine.  Instilling and maintaining discipline and morale in these young men who will be required to bear weighty responsibility in the face of adversity – at times extreme – is a matter of substantial national importance scarcely within the competence of the judiciary."*

- *Wasson v. Trowbridge*, 382 F.2d 807, 812 (2d Cir. 1967)

Plaintiff N.B., a former cadet, brings the instant action against defendants United States Merchant Marine Academy (the "Academy"), the United States Department of Transportation, and the United States of America.  Plaintiff claims defendants unlawfully disenrolled him as a result of an unfavorable determination at an Academy disciplinary hearing finding plaintiff sexually assaulted a fellow midshipman (the "complainant").  Plaintiff argues the hearing violated the Administrative Procedure Act (the "APA") and the Due Process Clause of the Fifth Amendment.  Plaintiff claims that he is entitled to equitable and injunctive relief, as well as compensatory and punitive damages.

1

Plaintiff now seeks a preliminary injunction that would compel the Academy to immediately reinstate him, thereby permitting him to graduate from the Academy and receive his diploma, and further seeks a consolidated determination with the merits of the action. For the reasons set forth below, the plaintiff's request for consolidation with the merits is GRANTED, but his request for a preliminary injunction is DENIED and the matter DISMISSED.

## BACKGROUND

### A. Procedural History

On November 17, 2020, the Academy notified plaintiff that he was charged with violating Superintendent Instruction 2018-04, *Sexual Assault, Sexual or Gender-Based Harassment, Relationship Violence, Stalking, and Retaliation Policy* ("SI 2018-04") and Chapter 3.12 of the Midshipman Regulations, *Sexual Assault, Sexual or Gender-Based Harassment, Relationship Violence, Stalking, and Sexual Exploitation* ("Midshipman Regulations Chapter 3.12"). Administrative Record ("AR") 1. On November 30, 2020, the Academy's Executive Board (the "Board") held a hearing via Zoom over which the Deputy Superintendent presided and, by a vote of 3-0, found by a preponderance of the evidence that plaintiff had violated SI 2018-04 and Midshipman Regulations Chapter 3.12 by sexually assaulting the complainant, and recommended that plaintiff be disenrolled from the Academy. AR 307-10, 312. On December 10, 2020, the Superintendent upheld the Board's findings and disenrolled plaintiff. AR 312-13. That same day, plaintiff requested an appeal to the Maritime Administrator. AR 314. On March 16, 2021, the Acting Maritime Administrator upheld the Superintendent's decision. AR 946. On March 28, 2021, plaintiff filed the complaint in this action, seeking relief from his allegedly unlawful disenrollment from the Academy. DE 1. On April 5, 2021, the Court[1] granted a Temporary

---

[1] On March 29, 2021, this case was assigned to the late Judge Sandra J. Feuerstein. This case was reassigned to the undersigned on April 12, 2021.

Restraining Order (TRO) ordering that plaintiff be reinstated to the Academy and permitted to attend classes pending determination of plaintiff's preliminary injunction. DE 8. Plaintiff now moves for a preliminary injunction and seeks consolidation with a trial on the merits pursuant to Fed. R. Civ. P. 65. DE 12. Pending this Court's review of the Academy's disciplinary decision, plaintiff is currently in deferred graduate status.[2] DE 19.

*B. Facts*

Plaintiff met complainant in September 2017 during their first year at the Academy. AR 26. Plaintiff and complainant had a consensual, intermittent relationship that lasted until December 2017. AR 26, 37, 135. During this time, plaintiff and complainant engaged in "rough" sex, but always with consent. AR 34, 37, 635-36, 437-38, 139. Plaintiff and complainant were disciplined by the regiment for having a relationship during their "plebe" year and subsequently terminated their relationship. AR 26, 135, 137. In March 2018, complainant began a relationship with another midshipman. AR 26. In November 2018, complainant's boyfriend left for his "sea year" just as plaintiff returned from his. AR 26, 43. Around this time, complainant and plaintiff reconnected after complainant sent plaintiff old photos via Facebook. AR 199-200, 359-60. Then, in December 2018, plaintiff and complainant had a number of sexual encounters that are the subject of the underlying dispute.

Complainant testified that plaintiff had sex with her three times without her consent in December 2018. In the first incident, plaintiff visited complainant's room one evening unannounced while her roommate was away. AR 28. Plaintiff sat himself down in a chair and started speaking with complainant about whether they should be friends. AR 28. As plaintiff drew

---

[2] While in deferred graduate status, plaintiff "[was] permitted to participate in graduation exercises [on June 19, 2021], but will not receive [his] diploma and U.S. Coast Guard License, and will not be permitted to take the[] officer's oath into the armed services." DE 19 (quoting SI 2020-02 ¶ 5(b)).

himself closer to complainant, she climbed up onto her desk and then the windowsill to back away. AR 28.  Plaintiff gave complainant a kiss, and she pushed away.  "No, we shouldn't do this, I have a boyfriend," she told him.  AR 28, 308.  Undeterred, plaintiff wrestled with her on the desk, attempting to remove her shorts as she repeatedly told him no.  AR 28.  "It was a continuous protest," complainant testified.  AR 28.  She tried pushing him away, but plaintiff was too strong for her.  AR 28.  Plaintiff removed her shorts and penetrated her.  AR 28, 308.  Stunned, complainant cried that night, guilt-ridden that she had been "forced to cheat" on her boyfriend. AR 30.

Trying to pretend as if nothing happened, complainant blamed herself for not "fight[ing] back hard enough" and continued socializing with the same circle of friends, including plaintiff. AR 30-31.  In the second incident, complainant and plaintiff were drinking in his room one night with friends.  AR 31.  All the chairs were taken, so complainant sat on the bed.  AR 31.  After the friends left, plaintiff sat on the bed beside complainant.  AR 31.  Complainant told plaintiff she did not want to have sex and pushed him away.  AR 31.  Plaintiff grabbed complainant's head, placed his genitals into her mouth, and forced her to perform oral sex.  AR 31, 33-34.  Suddenly, another midshipman entered the room, and complainant hid under the blanket.   AR 31. Complainant tried to leave when the midshipman exited the room, but plaintiff begged her to stay and told her he loved her.  AR 31.  Complainant left once plaintiff fell asleep.  AR 31.  She was up all night, angry that once again she had been "forced to cheat."  AR 31.  In text messages, complainant told plaintiff that "this really has to stop," and "I really don't want anything anymore." AR 269.

The third incident took place when complainant returned to plaintiff's room to confront him over the coerced oral sex.  AR 31.  After she yelled at him, plaintiff became angry and shut

4

the door before she could leave.  AR 35.  He then forced her over a chair, pinned her arm behind her back, and pulled down her pants.  AR 31.  Complainant struggled and repeatedly told plaintiff to stop and let her go.  AR 31, 35-36.  Ignoring her protests, plaintiff said he could not control himself.  AR 31-32.  Complainant faced the door as plaintiff penetrated her from behind, "almost as if [she] was being taunted."  AR 32.  Following this incident, complainant deleted plaintiff from her contacts and blocked him.  AR 32.

According to plaintiff, he and complainant had four, not three, sexual encounters during the subject period.  The first encounter on December 1, 2018 only involved foreplay.  Plaintiff and complainant touched each other's intimate parts and complainant gave plaintiff a hickey.  AR 205, 644, 651.  Plaintiff and complainant, both in relationships at the time, convinced themselves this was not "technically" cheating.  AR 205.  Complainant did not recall this "half incident," and testified that plaintiff got a hickey because she bit him to stop anything further from happening.  AR 473-75.  After this encounter, complainant sent plaintiff a number of suggestive but ambiguous text messages.  In one text, for example, complainant told plaintiff she felt "adicted [sic]" to sex and needs sex "at least once" a day but "it wouldn't be worth it" because she felt an emotional attachment to her boyfriend.  AR 227-28.

In plaintiff's account, the second encounter occurred on December 5, 2018.  One evening, plaintiff visited complainant in her room and sat in a chair beside her.  AR 589.  As plaintiff inched towards complainant, she backed away but did not climb onto the windowsill.  AR 138.  Plaintiff placed her leg on his lap, and they talked and laughed as he rubbed her feet.  AR 138-39, 589.  Although complainant told plaintiff, "no, I have a boyfriend," there was a "kinky, sexual, kind of playfulness about it" which he interpreted as role-play.  AR 139.  Measuring 5′ 4″, plaintiff claims he does not have the stature to have sex with complainant on a desk.  AR 330, 592.  Plaintiff avers

that complainant climbed up the ladder into her bunkbed and he joined her.  AR 590.  Plaintiff

then locked the door, allegedly at complainant's instruction.  AR 28, 590.  Although complainant

tried to stop plaintiff from pulling down her shorts, plaintiff maintains she held her shorts loosely

in a manner suggestive of role-play.  AR 140.  Complainant then opened her legs, and they had

sexual intercourse.  AR 309.  At the hearing, plaintiff testified that he believed the sex was

consensual even though complainant said "no" and had not consented to role-playing:

> Deputy Superintendent: She said the word N-O?
> Plaintiff: Yes, ma'am.
> Deputy Superintendent: Okay. And then you went on and you say it was a kinky
> sexual kind of playfulness about it, like it's dirty to do that with her. … Did you
> agree on any sort of role playing?
> Plaintiff: During the event, we didn't say specifically that we were going to role
> play[.]"
> …
> Deputy Superintendent: So, what – so you're saying [is] that you, even though she
> said no, you thought it was consensual?
> Plaintiff: Yes, ma'am.

AR 594-96.

After that night, plaintiff "heavily" questioned himself whether complainant wanted to

have sex with him.  AR 139.  In his statement to the Board, plaintiff acknowledged, "The way I

am explaining it, it does sound weird and when I say if any other girl would have said no I would

have stopped immediately.  My initial reaction was that she was being playful.  I can't say

specifically that we were role playing, we didn't consent to that was a role playing situation."  AR

139.  Although plaintiff felt upset and thought he should have clarified the situation, plaintiff

believed his assumptions were correct after complainant began visiting his room.  AR 139.  The

next day, for instance, complainant texted plaintiff to ask if she could store leftovers in his

refrigerator.  AR 259-62.  Eight days later, complainant texted plaintiff that she was not pregnant

and "you can wake me up if you bring me a drink."  AR 279.

According to plaintiff, complainant reversed the order of the third and fourth encounters. AR 645.  In his account, he and complainant had sexual intercourse on the chair in his room on December 9, 2018.  AR 263, 652.  The last sexual encounter, which involved oral sex, took place a week later on December 16, 2018.  AR 280.  That night, plaintiff invited complainant over to his room for a drink.  AR 367.  According to plaintiff, complainant said she wanted to show him her new oral sex skills.  AR 136.  Plaintiff laid down in bed and she crawled in with him.  AR 136.  Complainant then tied her hair into a ponytail, climbed on top of plaintiff, and performed oral sex.  AR 369.  Plaintiff said in his statement that this last sexual encounter was the only time it was "fully consensual" and there was no role playing.  AR 141.  The midshipman who walked in on complainant performing oral sex also witnessed complainant on top of plaintiff.  However, he did not "particularly remember" the incident because he was drunk.  AR 123, 564.  The following day, complainant texted plaintiff that she "really like[s] forehead kisses" and sent him photos of them together at Winter Ball.  AR 283, 286.

For over a year and a half, complainant did not formally accuse plaintiff of sexual assault.  Although complainant knew these sexual encounters were not consensual, complainant did not call it rape because "it felt harsh."  AR 30.  Complainant did not consider these incidents rape until mid- to late 2019.  AR 30, 39.  In a message with plaintiff over social media, she accused him of sexual assault, which plaintiff found extremely upsetting.  AR 142.  Nonetheless, on April 7, 2020 complainant wrote to her boyfriend that, "I never felt like I was raped."  AR 109.  She told him, "I felt like I had cheated on you and I deserved all your hatred for it."  AR 109.  On June 29, 2020, complainant filed a restricted report against plaintiff with the Academy and then unrestricted the report on October 5, 2020, thereby allowing an investigation to begin.  AR 19, 134.

In October 2020, the Public Safety Officer (the "Safety Officer") interviewed six midshipmen, including plaintiff and the complainant, about the alleged sexual assaults. On November 6, 2020, the Safety Officer submitted his investigation file to the Deputy Superintendent. AR 19. On November 17, 2020, the Deputy Superintendent notified plaintiff that he was charged with violating SI 2018-04 and Midshipman Regulations Chapter 3.12 for allegedly sexually assaulting the complainant. AR 1, 307. SI 2018-04 prohibits the "intentional touching of a sexual nature … without the consent of another person." AR 948. The notice of hearing named the three officers presiding over the Executive Board Disciplinary Hearing and the four witnesses the Academy intended to call at the hearing. AR 1-2. The Safety Officer was not one of the three officers on the Board. The notice, which plaintiff signed, advised him of his rights:

1) "To receive a copy of the investigatory file;"
2) "To seek the advice and assistance of legal counsel … [who] may be present at the hearing to consult and advise you, but may not otherwise participate;"
3) "To challenge the impartiality of any of the hearing officers;"
4) "To remain silent through the hearing;"
5) "To be present during the entire hearing;"
6) "To make opening and closing statements;"
7) "To present evidence including but not limited to documentary evidence and the testimony of reasonably available witnesses;"
8) "To question all witnesses," except complainant whom the plaintiff may question by submitting questions the Board will review and ask;
9) "To receive, upon request, a copy of the recording of the hearing;" and
10) "To appeal a decision of disenrollment."

AR 2-4.

Attached to the notice was a copy of the Executive Board's Standard Operating Procedure (SOP) for sexual assault hearings, which states, "Executive Board Disciplinary Hearings are conducted in an informal, non-adversarial manner" and "[t]he rules of evidence for judicial proceedings do not apply …." AR 4, 6. In addition, the SOP provides that a hearing officer must have received annual training on the adjudication of sexual misconduct cases and be trained in

seven subject areas.  AR 6.  Finally, the Academy also provided plaintiff the full investigatory file compiled by the Safety Officer.  AR 307.  Before the hearing, plaintiff submitted to the Board over 100 pages of supposedly exculpatory text messages between himself and complainant.  AR 197-306.

On November 30, 2020, the Board held the hearing via Zoom.  AR 339.  The Board listened to six witnesses, two of whom were called by the plaintiff.  AR 307.  Plaintiff's faculty advisor was present during the entirety of the hearing.  AR 307.  Plaintiff had an opportunity to question each of the witnesses called by the Academy, and gave an opening and closing statement.  AR 357-79.  Following the plaintiff's opening statement, the Board called the Safety Officer to provide an executive summary of his investigation.  AR 379-92.

Per the Academy's SOP, the investigator is to provide a "brief statement" summarizing the investigation.  AR 14.  Before summarizing the three alleged sexual assaults, the Safety Officer testified that "hormones … released in a traumatic event can interfere with the victim's ability to gather, organize and consolidate memories."  AR 383.  He listed the side effects of PTSD and commented that complainant has "related or displayed almost all of these effects of being sexually assaulted."  AR 384.  When asked by the Deputy Superintendent, the Safety Officer confirmed that the complainant displayed the characteristics of a sexual assault victim.  AR 392-93.  When plaintiff asked the Safety Officer whether it is "normal" for a sexual assault to occur when the victim climbs up a ladder into bed, he replied, "In my experience, a sexually assaulted victim, number one, doesn't remember everything about the encounter and, number two, … they become very submissive … because of these hormones that are released."  AR 401-02.  Plaintiff did not object to the Safety Officer's testimony.

During plaintiff's questioning, the Safety Officer stated that he read "some" of the text messages plaintiff submitted.  AR 398.  Complainant testified that plaintiff misrepresented their conversations by cherry-picking texts, while plaintiff maintained that he omitted only irrelevant text messages.  AR 487, 630.

At the end of Phase I, the determination phase, the Board deliberated and unanimously found by a preponderance of the evidence that plaintiff violated SI 2018-04 and Midshipman Regulations Chapter 3.12 by sexually assaulting the complainant.  AR 307, 673-74.  In Phase II, the sanction phase, plaintiff called three character witnesses and made a statement in his defense.  AR 675-707.  After deliberating, the Board announced that plaintiff should be disenrolled.  AR 707.

On December 8, 2020, the Board summarized its findings in a recommendation to the Superintendent.  AR 307.  In its recommendation, the Board determined by a preponderance of the evidence that plaintiff sexually assaulted complainant based upon, *inter alia*, plaintiff's admission that complainant told him "no, I have a boyfriend, we shouldn't do this," plaintiff's admission that he did not believe complainant meant "no," plaintiff's admission that "if any other girl would have said no I would have stopped immediately," and plaintiff's admission that he did not obtain consent for a sexual role-playing experience and interpreted her protests as role-playing.  AR 308.

In its recommendation, the Board considered plaintiff's defenses that complainant told him to lock the door before they had sex, that she subsequently sought him out in his room, and said she wanted to show him her new oral sex tricks.  AR 309.  The Board discounted plaintiff's testimony because of his own admission that she said "no" before they had sex and that he heavily questioned himself after their first encounter.   The Board also discounted the text messages plaintiff submitted because complainant testified that plaintiff had excluded text messages where

10

she protested against his unwanted sexual advances.  AR 309.  Indeed, plaintiff only presented 12 days out of 55 days of text messages.  AR 309.  The Board noted the Safety Officer's testimony that complainant displayed characteristics of a sexual assault victim such as "anger, confusion, and inability to maintain eye contact."  It also noted two other witnesses' testimony that after December 2018 complainant's affect changed, from that of a "social butterfly" to seemingly depressed.  AR 309.  The Board believed that plaintiff's actions rendered his Academy career unrecoverable and doubted his ability to perform as a mariner because of issues of trustworthiness.  AR 310.  Thus, the Board recommended disenrollment because plaintiff's behavior revealed he lacks the characteristics of an exemplary leader.  AR 310.

## STANDARD OF REIVEW

A party seeking preliminary injunctive relief must demonstrate "(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction." *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011) (citation omitted).  In addition, where the preliminary injunction will affect governmental action "taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard."  *Doe v. United States Merch. Marine Acad.*, 307 F. Supp. 3d 121, 143 (E.D.N.Y. 2018) (citing *Sussman v. Crawford*, 488 F.3d 136, 140 (2d Cir. 2007) (citations omitted)).  Further, if the party seeks a "mandatory injunction" altering the status quo, then the party must make a "'clear' or 'substantial' showing of a likelihood of success on the merits.'"  *Doe*, 307 F. Supp. at 143 (citing *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996)).  The Court has "wide discretion in determining whether to grant a preliminary

injunction," as it is "one of the most drastic tools in the arsenal of judicial remedies." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citations omitted).

## DISCUSSION

### A. Consolidation with a Determination on the Merits

Plaintiff requests to consolidate the motion for a preliminary injunction with a "trial on the merits" pursuant to Rule 65 of the Federal Rules of Civil Procedure.  DE 12 at 5.  Rule 65(a)(2) of the Federal Rules of Civil Procedure provides that "[b]efore or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing."  When consolidating a motion for a preliminary injunction with a trial on the merits, "the court must preserve any party's right to a jury trial."  Fed. R. Civ. P. 65(a)(2).  There is no right to trial by jury for APA claims, which are equitable in nature.  5 U.S.C. § 702 ("A person suffering legal wrong because of agency action … is entitled to *judicial* review thereof") (emphasis added); *Cox v. United* States, 332 U.S. 442, 453 (1947) ("[T]he constitutional right to jury trial does not include the right to have a jury pass on the validity of an administrative order.").  Under Rule 65(a)(2), a matter may be consolidated where the parties are permitted to present all material evidence.  *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 101 (2d Cir. 1985).  Since the full record is before the Court, a separate trial on the merits would be a waste of time and resources.  Moreover, the government has not objected to plaintiff's request to consolidate the motion for a preliminary injunction with a trial on the merits.  DE 17 at 1; DE 18 at 1.  As such, the Court exercises its discretion to consolidate the merits of this case with the preliminary injunction determination herein.

## B.  *Irreparable Harm*

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted).  "[T]he alleged injury must be one incapable of being fully remedied by monetary damages." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990).  The irreparable harm must be actual and imminent, not remote or speculative, and must establish that such harm is likely in the absence of an injunction.  *Id.*  Additionally, the moving party should act diligently to enforce their rights because delay may "indicate an absence of the kind of irreparable harm required to support a preliminary injunction."  *Costello v. McEnergy*, 767 F. Supp. 72, 78 (S.D.N.Y. 1991) (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985)).

Plaintiff has shown he will suffer irreparable harm if not granted injunctive relief.  Absent injunctive relief, plaintiff will not receive his diploma or U.S. Coast Guard License and will not be permitted to take the officer's oath into the armed services.  DE 19.  Without question, this is a serious matter.  Courts in this circuit have previously held that a disruption of one's education constitutes irreparable harm.  *See, e.g.*, *Doe v. Univ. of Connecticut*, No. 3:20-CV-92 (MPS), 2020 WL 406356, at *2 (D. Conn. Jan. 23, 2020) ("[A] two-year suspension and a sanction for sexual assault would indeed 'forever change[ ]' the trajectory of [plaintiff's] education and career" because "he would need to explain a gap on his résumé"); *see also Doe v. Rensselaer Polytechnic Inst.*, No. 1:20-CV-01359 (BKS)(CFH), 2020 WL 6544607, at *6 (N.D.N.Y. Nov. 6, 2020) (losing coursework completed prior to plaintiff's mid-semester suspension is sufficient to show irreparable harm).  Monetary relief cannot compensate plaintiff for loss of his college diploma or fill the

resulting gap in his education.[3]  Plaintiff diligently sought injunctive relief in this Court just twelve days after the Acting Maritime Administrator dismissed his appeal.  DE 1.  Although the government claims plaintiff failed to demonstrate an urgency to return to school because he missed make-up classes, DE 17 at 31, following this Court's TRO, plaintiff completed all second trimester exams and attended his third trimester classes.  DE 12-1, ¶¶ 5-6.  For these reasons, plaintiff satisfies the irreparable harm prong for injunctive relief.

### C.  Likelihood of Success

### 1.  Administrative Procedure Act

Plaintiff challenges the Superintendent's decision under the Administrative Procedure Act, 5 U.S.C. § 701 et seq.  The APA applies because defendants are agents under 5 U.S.C. § 701, *see Doe*, 307 F. Supp. 3d at 143, and agency action is subject to judicial review when it is "final" and there is "no other adequate remedy in a court."  5 U.S.C. § 704.  The Board's decision is final because the Superintendent adopted the Board's recommendation and the Acting Maritime Administrator denied plaintiff's appeal.  AR 312-13, 946; *see* SOP "15. Right to Appeal" ("Unless the Superintendent or Maritime Administrator sends the matter back to the hearing officer(s) for further proceedings, the decision of the Superintendent or Maritime Administrator is final and the matter is closed.").  The APA provides that "'[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof,' unless review is precluded by statute or the complained-of decision was committed to agency discretion."  *Ruiz v. Mukasey*, 552 F.3d 269, 273 (2d Cir. 2009) (quoting 5 U.S.C. § 702).

---

[3] *Phillips v. Marsh*, 687 F.2d 620, 622 (2d Cir. 1982) (interruption of academic work may create irreparable harm because the loss of time, military seniority, education and status resulting from dismissal cannot be adequately compensated at law) (citing *Doe v. New York University*, 666 F.2d 761, 773 (2d Cir. 1981)).

Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  An agency action is arbitrary and capricious where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Additionally, an agency action may be arbitrary and capricious if they fail to follow their own procedures and regulations. *See, e.g.*, *Lightsey v. King*, 567 F. Supp. 645, 649-50 (E.D.N.Y. 1983) (Academy's refusal to reestablish exam grade after the Honor Board exonerated midshipman of cheating was arbitrary and capricious).  "If there is sufficient evidence in the record to provide rational support for the choice made by the agency, [the court] must uphold its decision."  *Constitution Pipeline Co. v. N.Y.S. Dep't of Envtl. Conservation*, 868 F.3d 87, 102 (2d Cir. 2017) (quotation marks and citation omitted); *see also Doe v. United States Merch. Marine Acad.*, 307 F. Supp. 3d 121, 128, 143-44, 147 (E.D.N.Y. 2018) (explaining standard of review under the APA).  Importantly, then, it is not this Court's role to examine the evidence *de novo* and draw its own conclusions.  The question is, rather, on this record, whether the Superintendent's decision was rationally supported by the evidence.

Plaintiff argues the Superintendent's determination that he violated SI 2018-04 and Midshipman Regulations Chapter 3.12 by sexually assaulting the complainant was arbitrary and capricious.  DE 12 at 9-12.  The Court disagrees.  In written and oral admissions, plaintiff stated that he had intercourse with the complainant on December 5, 2018 after she told him no.  AR 139,

594-96.  He proceeded to have sex with complainant despite her protests because he believed she was roleplaying despite the fact that she never consented to roleplaying.  AR 139.  Plaintiff also admitted that he "heavily" questioned himself afterward and felt upset because he knew he should have clarified whether complainant wanted to have sex.  AR 139.  Although some of complainant's text messages exhibited indicia of consent, this does not change the fact that plaintiff admitted he had sex with complainant without her consent.   In light of these uncontested facts, the Superintendent's conclusion that plaintiff engaged in "intentional touching of a sexual nature … without the consent of another person" in violation of SI 2018-04 does not run counter to the evidence before the Academy and is not so implausible that it could not be ascribed to a difference in view or agency expertise.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43.  Thus, the Court finds that the Superintendent's decision was not arbitrary and capricious.

In reaching its conclusion, the Board took into consideration the relevant facts and assessed the countervailing evidence presented by plaintiff.   *See Yu v. United States Dep't of Transportation*, 440 F. Supp. 3d 183, 200 (E.D.N.Y. 2020) (Academy's decision to disenroll plaintiff was not arbitrary and capricious because it considered the relevant factors when rejecting plaintiff's theory that he may have been drugged when he assaulted a man and crashed his car). The Board acknowledged plaintiff's testimony that complainant told him to lock the door before they had intercourse, complainant subsequently sought him out in his room, and said she wanted to show plaintiff her oral sex skills.  AR 309.  The Board reasonably discounted plaintiff's testimony in light of his uncontested admissions.  *Doe*, 307 F. Supp. 3d at 148-49 (Superintendent entitled to weigh the evidence where plaintiff contradicts complainant's testimony and presents witnesses supporting his version of events).  The Board also considered the sexually suggestive text messages plaintiff submitted into evidence, but discounted them as selective, representing only

16

12 out of 55 days of text messages.   Complainant testified that he excluded texts where she protested his unwelcome advances.  AR 309.  Notwithstanding countervailing evidence which the Board did not specifically address in their recommendation to the Superintendent, *e.g.,* the complainant's message to her boyfriend that, "I never felt like I was raped,"  AR 109, 309, given the lower preponderance standard of proof in the Board's sexual assault disciplinary hearings and the plaintiff's multiple admissions that he had non-consensual sex with complainant, the Court finds there is sufficient evidence supporting the agency's determination that plaintiff violated that regulations.  *See Doe*, 307 F. Supp. 3d at 148 n.14, 148-49 ("there is simply no likelihood" the Superintendent's finding that plaintiff violated the Academy's sexual assault policy was arbitrary or capricious where plaintiff admitted a friend told him complainant was too drunk to consent to sexual intercourse); *see also Yu*, 440 F. Supp. 3d at 190-91, 200-01 (sufficient evidence supported the Superintendent's determination that an intoxicated midshipman did not recall assaulting a man not because he was drugged but because he blacked out); *cf. Caiola v. Saddlemire*, No. 3:12-CV-00624 (VLB), 2013 WL 1310002, at *6 (D. Conn. Mar. 27, 2013) (no due process violation because substantial evidence supported finding of sexual assault where plaintiff admitted he did not accept the complainant's rejections and persisted until she relented).

For these reasons, the Board's determination that plaintiff violated SI 2018-04 and Midshipman Regulations Chapter 3.12 was not arbitrary and capricious.[4]

### 2.   Fifth Amendment

### i. Procedural Due Process

---

[4] In a footnote, plaintiff argues unconvincingly that, because complainant alleged each sexual encounter was nonconsensual, "[a] finding that any of the four encounters was consensual would belie a finding that the other encounters were nonconsensual."  DE 12 at 9, n.5.  Plaintiff's syllogism presents a false dilemma.  The Board could have consistently found that complainant consented to one sexual encounter but not another, regardless of what she alleged.  "[C]onsent to sexual conduct, even if once given, may thereafter be withdrawn at any time."  *Jacobson v. Blaise*,157 A.D.3d 1072, 1079 (2018) (quoting N.Y. Educ. Law § 6441).

Plaintiff alleges that the hearing violated his procedural and substantive due process rights guaranteed under the Fifth Amendment.   In the context of a Merchant Marine Academy disciplinary hearing, "due process only requires for the dismissal of a Cadet … that he be given a fair hearing." *Wasson v. Trowbridge*, 382 F.2d 807, 812 (2d Cir. 1967).  A "fair hearing" requires that the accused be "apprised of the specific charges against him" and "given an adequate opportunity to present his defense both from the point of view of time and the use of witnesses and other evidence." *Doolen v. Wormuth*, No. 18-2996, 2021 WL 3044316, at *8 (2d Cir. July 20, 2021) (quoting *Wasson*, 382 F.2d at 812); *see also Doe*, 307 F. Supp. 3d at 150-51 (setting forth standard of review for procedural due process claims).  In addition, "at a hearing at which Academy officials will determine whether or not a cadet will be expelled[,] the cadet must be allowed to appear and present evidence, including witnesses, on his behalf." *Doolen*, 2021 WL 3044316, at *8 (quoting *Hagopian v. Knowlton*, 470 F.2d 201, 211 (2d Cir. 1972), *overruled on other grounds by Phillips v. Marsh*, 687 F.2d 620 (2d Cir. 1982)).

Because "[f]ew decisions properly rest so exclusively within the discretion of the appropriate government officials [as] the selection training, discipline and dismissal of the future officers of the military and Merchant Marine," a disciplinary proceeding conducted "within these bounds of procedural due process would be proper and immune from constitutional infirmity." *Andrews v. Knowlton*, 509 F.2d 898, 904-05 (2d Cir. 1975) (quoting *Wasson*, 382 F.2d at 812). Hence, in the context of a school or military disciplinary proceeding, ordinary procedural due process requirements may not be required.  *Doe*, 307 F. Supp. 3d at 150, 154 (right to cross-examine witnesses is not considered an essential requirement of due process in school disciplinary proceedings) (citing *Winnick v. Manning*, 460 F.2d 545, 549 (2d Cir. 1972)); *see also Crowley v. U.S. Merch. Marine Acad.*, 985 F. Supp. 292, 297 (E.D.N.Y. 1997) ("[T]he courts generally have

18

declined to recognize a right to representation by counsel, as a function of due process, in military academy disciplinary proceedings concerning non-criminal acts[.]").  Additionally, a due process violation may occur if an agency fails to follow their own procedures and regulations.  *See, e.g.*, *Lightsey*, 567 F. Supp. at 649-50 (Academy's refusal to reestablish exam grade after Honor Board exonerated midshipman of cheating violated due process); *see also United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).

It is undisputed that plaintiff's hearing complied with the basic requirements of procedural due process.  As required under *Wasson v. Trowbridge*, the notice of hearing apprised plaintiff of the specific charges against him and plaintiff was given an adequate opportunity to present his defense.  AR 1, 357-79.  In addition, plaintiff 1) received a copy of the investigatory file; 2) submitted over 100 pages of text messages into evidence; 3) had the right to challenge the impartiality of a hearing officer; 4) had the right to seek the advice and assistance of legal counsel; 5) made an opening and closing statement; 6) had the right to question witnesses; 7) called two witnesses of his own; and 8) had the right to appeal.  AR 1, 197-306, 307, 357-378.  Unlike in *Doe v. University of Connecticut*, where the school never provided an opportunity to cross-examine certain witnesses and refused to hear from others, 2020 WL 406356, at *4 (D. Conn. 2020), here the Academy satisfied the requisites of procedural due process in a disciplinary hearing.  *See Doe*, 307 F. Supp. 3d at 127 (due process protections afforded to midshipman at the Academy's sexual assault disciplinary hearing "more than sufficient" to satisfy the Fifth Amendment); *see also Cassidy v. United States*, No. 17-CV-4187(SJF)(AYS), 2018 WL 6088146, at *13 (E.D.N.Y. Nov. 20, 2018) (procedures in Academy's sexual assault hearing did not deprive plaintiff of due process).

Plaintiff claims the Safety Officer provided improper testimony, thereby depriving him of a fair hearing.  First, plaintiff argues that the Safety Officer improperly opined that the plaintiff sexually assaulted complainant.  DE 7-6 at 22.  Investigators are generally allowed to testify at sexual assault disciplinary hearings.  *Cf. Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 466 (S.D.N.Y. 2015) ("no authority … providing that Title IX prohibits a school's Title IX investigator from testifying at the disciplinary hearing.").[5]  The closest the Safety Officer came to stating as a matter of fact that plaintiff sexually assaulted the complainant was when he listed the side effects of PTSD and commented that complainant "related or displayed almost all of these effects of being sexually assaulted."  AR 384.  When later asked by the Deputy Superintendent, the Safety Officer confirmed that the complainant displayed the characteristics of a sexual assault victim.  AR 392-93.  Mere commentary by an investigator in a school disciplinary hearing that a complainant's behavior is consistent with sexual assault does not deprive one of a fair hearing.  *See Yu*, 97 F. Supp. 3d at 466-67 (investigator's comment that "the information gathered 'appears to suggest' that Complainant … exhibited behaviors to suggest that she was incapacitated prior to, and during, the incident'" did not make the proceeding flawed).  The Safety Officer's brief conjecture that complainant's demeanor was consistent with sexual assault, although highly speculative, did not deprive plaintiff of a fair hearing.  Like the investigator in *Xiaolu Peter Yu v. Vassar Coll.* who briefly commented that the complainant may have been incapacitated, here the Safety Officer "had no decision making role in the outcome of the hearing" and "there is no reason to believe that the panel members could have confused [the Safety Officer's] testimony to be anything other than the statements of the investigator."  *Yu*, 97 F. Supp. 3d at 466.

---

[5] Although Title IX does not apply to the Academy, 20 U.S.C. § 1681(a)(4) ("[T]his section shall not apply to an educational institution whose primary purpose is the training of individuals for the military services of the United States, or the merchant marine."), *Xiaolu Peter Yu v. Vassar Coll.* still stands for the proposition that it is commonplace for investigators to testify at sexual assault disciplinary hearings held in academic settings.

Although plaintiff cites *Jacobson v. Blaise* for the proposition that investigators cannot give improper testimony at a disciplinary hearing, that case is distinguishable because there the investigator misstated the law by testifying that consent must be given verbally.  157 A.D.3d at 1079.  Plaintiff never alleges that the Safety Officer's testimony misstated the law or the facts. Even if the Safety Officer's testimony were improper, it would be harmless error because the Board also relied on the testimony of two witnesses who stated that after December 2018 complainant went from being a social butterfly to depressed  AR 309.  *See Doolen*, 2021 WL 3044316, at *9 ("[T]he legal standard requires [plaintiff] to show more than the mere existence of a procedural violation; he must also show the violation caused substantial prejudice.").

Second, plaintiff argues the Academy failed to follow its own procedures because the Safety Officer's opinion testimony that complainant's behavior was consistent with sexual assault and his "expert" testimony that victims of sexual assault have difficulty recalling traumatic events went far beyond a "brief statement" summarizing the investigation.  DE 12 at 13.  This Court does not condone the Safety Officer's digression, however brief, into opinion testimony during what is supposed to be an impartial summary of the facts, and finds questionable the Safety Officer's broad generalization regarding victims' ability to recall traumatic events.  At the same time, the SOP does not state that an investigator is prohibited from offering opinion or expert testimony, AR 6-16, and it is not *per se* unconstitutional to have multiple roles in a disciplinary hearing, *see Doe*, 307 F. Supp. 3d at 150-51 (Superintendent's multiple roles as "prosecutor, fact-finder, and appeals court" do not render sexual assault hearing *per se* unconstitutional); *Wasson*, 382 F.2d at 813 ("combination of the functions of policeman and judge" in Merchant Marine disciplinary hearing is not *per se* unconstitutional).  The Safety Officer's executive summary, which spans twelve pages of the hearing transcript and objectively recounts the alleged sexual assaults from the perspectives

of both complainant and plaintiff, contains just a little over two pages of the opinion and expert testimony to which plaintiff objects.   AR 380-92.   Hence, the Safety Officer's testimony constituted a "brief statement" of the investigation and substantially complied with the procedures set forth in the Academy's SOP.

Third, plaintiff argues that as an "expert" witness the Safety Officer should not have opined whether the alleged victim was in fact sexually assaulted.  DE 7-6 at 21-22.  However, all the cases cited by plaintiff – *People v. Williams*, 20 N.Y.3d 579, 584 (2013); *People v. Carroll*, 95 N.Y.2d 375, 387 (2000); and *People v. Jerge*, 90 A.D.3d 1486, 1487 (2011) – are inapposite because plaintiff's hearing was not a criminal trial.  *Doe*, 307 F. Supp. 3d at 127 ("[D]ue process does not mandate the use of all of the protections of a criminal trial in this type of disciplinary proceeding."). As set forth in the SOP, the rules of evidence do not apply in the Academy's sexual assault disciplinary proceedings.  AR 6.

Without question, some of the Safety Officer's quasi-medical testimony bordered on quackery, and the Academy should not have permitted this testimony.  Even assuming some of the Safety Officer's psychological and endocrinological assertions could have scientific basis – a proposition that seems highly dubious – it seems beyond peradventure that he lacked the qualifications to provide these opinions.  This error, though, is mitigated by the Superintendent's decision, which appeared to put no weight on the Safety Officer's foray into medical science, and is amply supported by independent evidence, including the plaintiff's admissions.

Although plaintiff claims he would have retained an expert had he known that the Safety Officer would give expert testimony, DE 7-1 ¶¶ 53-55, plaintiff was notified that the Safety Officer would testify at the hearing and plaintiff had the right to call his own witnesses at trial, AR 1-4. At the hearing, plaintiff never objected to the Safety Officer's testimony regarding sexual assault

victims' difficulty recalling traumatic events – even when plaintiff elicited this testimony during his questioning of the Safety Officer. AR 401-02. Plaintiff argues that the Safety Officer's expert testimony that trauma prevents sexual assault victims from accurately recalling events made it impossible for him to mount a defense against the complainant. DE 7-6 at 22-23. Any hypothetical prejudicial effect from the Safety Officer's testimony is harmless given the strong countervailing evidence supporting the Board's determination that plaintiff sexually assaulted complainant. *Doolen*, 2021 WL 3044316, at *9. For these reasons, the Safety Officer's testimony did not deprive plaintiff of a fair hearing.

Plaintiff also claims that he was deprived of a fair hearing because the Safety Officer read only some of the text messages he submitted. DE 12 at 12. The Board, not the Safety Officer, is charged with making a determination on the basis of the evidence before it. In its recommendation to the Superintendent, the Board considered the "large volume of sexually explicit text messages" submitted by plaintiff. AR 309. The Acting Maritime Administrator then upheld the Superintendent's decision after reviewing the "written record in its entirety" including plaintiff's appeal, which painstakingly detailed the many explicit text messages between himself and complainant. AR 322-24, 946. Because the agency considered all the evidence plaintiff submitted, including the text messages, plaintiff was not deprived of a fair hearing.

Plaintiff's additional argument that the Board failed to follow its own procedures because hearing officers must receive an annual training on the adjudication of sexual misconduct claims and seven separate subject areas also fails. DE 7-6 at 23. The SOP does not state that the Academy must prove to plaintiff that the hearing officers have completed the required training. AR 6. Regardless, the hearing officers did in fact receive the required training in compliance with the SOP. DE 17 at 18.

*ii. Disproportionate Punishment*

Plaintiff argues unpersuasively that the Superintendent's decision violates due process because disenrollment is disproportionate to the alleged misconduct.  DE 7-6 at 23-24.  SI 2018-04 explicitly states that Class I violations such as sexual assault are subject to the "full range of penalties … set out in the Midshipman Regulations, up to and including disenrollment."  AR 948.  Expulsion is a constitutionally valid sanction for violations of a military academy Honor Code.  *See Andrews*, 509 F.2d at 907-08 (West Point's sole penalty of expulsion does not offend due process).  While some could disagree as to the appropriate punishment on these facts, the Court is "loathe to substitute its judgment for that of the [Academy], as '[f]ew decisions properly rest so exclusively within the discretion of the appropriate government officials [as] the selection, training, discipline and dismissal of the future officers of the military and Merchant Marine.'"  *Sell v. United States*, No. 19-CV-3105 (RJD) (RER), 2020 WL 3791847, at *5 (E.D.N.Y. July 7, 2020) (citing *Wasson*, 382 F.2d at 812); *Andrews*, 509 F.2d at 905 ("[W]e recognize the constitutional permissibility of the military to set and enforce uncommonly high standards of conduct and ethics.").  The Academy's decision to disenroll plaintiff is soundly within its discretion and does not violate due process.[6]

For these reasons, the Court finds that plaintiff has failed to establish a procedural due process violation.[7]

---

[6] Plaintiff points out that another midshipman found guilty of sexual assault was suspended for only nine weeks.  DE 7-6 at 24.  Regardless of the punishment administered in that case, disenrollment is not an unusual penalty for sexual assault.  Since 2014, the Academy has disenrolled 8 out of the 9 midshipmen found responsible for violating the Academy's sexual assault policy.  DE 17 at 29.

[7] Because the Academy's decision is not arbitrary and capricious, plaintiff cannot satisfy the more demanding standard required for a substantive due process violation.  *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999) ("Substantive due process . . . . does not forbid governmental actions that might fairly be deemed arbitrary or capricious . . ..") (citing *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).  Furthermore, plaintiff's conclusory allegation in the complaint that the Academy's decision was motivated by bad faith, DE 1 ¶ 142, is insufficient to plausibly allege a substantive due process claim.  *Horton v. Westling*, 284 F. Supp. 3d 213, 222 (N.D.N.Y. 2018), *aff'd*, 765 F. App'x 531 (2d Cir. 2019).  Nothing about the plaintiff's hearing, which provided him

### D.  Balance of Equities and Public Interest

Because plaintiff has not established he is likely to prevail on the merits and seeks a preliminary injunction that will affect governmental action "taken in the public interest pursuant to a statutory or regulatory scheme," the Court need not consider whether, in the alternative, this case presents sufficiently serious questions going to the merits to make them a fair ground for litigation.  *See Sussman*, 488 F.3d at 140; *Doe*, 307 F. Supp. 3d at 143 n.11.  Assuming *arguendo* that this lower standard applied, the Court would still conclude the standard is not met for the reasons discussed herein.  Furthermore, the public interest weighs heavily against granting a preliminary injunction because it is in the national interest that only Merchant Marine Officers of the highest moral character serve and defend the United States.  *Wasson*, 382 F.2d at 812 ("Instilling and maintaining discipline and morale in these young men who will be required to bear weighty responsibility in the face of adversity – at times extreme – is a matter of substantial national importance scarcely within the competence of the judiciary.").

## CONCLUSION

Based on the foregoing, it is hereby Ordered that:

- Plaintiffs' Motion for a Preliminary Injunction, which has been consolidated with the merits of the underlying action, is denied; and

- Judgment shall be entered in favor of defendants.

The Clerk is directed to enter judgment as above and close the case.

Dated:  Central Islip, New York
    August 3, 2021

                                         /s/ Gary R. Brown
                                        Gary R. Brown
                                        United States District Judge

---

a wide array of procedural rights and protections, can be said to "shock the conscience."  *Doe*, 307 F. Supp. 3d at 156-57.